# In the United States Court of Federal Claims

## OFFICE OF SPECIAL MASTERS
Filed: August 16, 2023

```
*  *  *  *  *  *  *  *  *  *  *  *  *
CHERISH MOORE,                      *
                                    *
              Petitioner,           *          No. 20-1589V
                                    *
v.                                  *          Special Master Gowen
                                    *
SECRETARY OF HEALTH                 *          Decision on Damages; Shoulder
AND HUMAN SERVICES,                 *          Injury Related to Vaccine
                                    *          Administration.
              Respondent.           *
*  *  *  *  *  *  *  *  *  *  *  *  *
```

*Jessica A. Olins,* Maglio Christopher & Toale, Seattle, WA, for petitioner.
*Madelyn Weeks,* U.S. Dept. of Justice, Washington, D.C., for respondent.

## DECISION ON DAMAGES[1]

On November 13, 2020, Cherish Moore ("petitioner") filed a petition for compensation in the National Vaccine Injury Compensation Program.[2]  Petition (ECF No. 1).  Petitioner alleged that the tetanus-diphtheria-acellular pertussis ("Tdap") vaccine she received on October 2, 2019 caused her to develop a right Shoulder Injury Related to Vaccine Administration ("SIRVA").  On January 31, 2023, I issued a Ruling on Entitlement, finding that petitioner had established she suffered a Table SIRVA and was entitled to compensation.  Ruling on Entitlement (ECF No. 45).

For the reasons discussed below, the undersigned finds that petitioner is entitled to an award of $125,000.00 for actual pain and suffering, $8,891.00 in lost wages, and $1,420.26 in past unreimbursed past expenses.

---

[1] Pursuant to the E-Government Act of 2002, *see* 44 U.S.C. § 3501 note (2012), because this decision contains a reasoned explanation for the action in this case, I am required to post it to a publicly available website.  This decision will appear at https://www.govinfo.gov/app/collection/uscourts/national/cofc or on the Court of Federal Claims website.  **This means the decision will be available to anyone with access to the Internet.**  Before the decision is posted on the court's website, each party has 14 days to file a motion requesting redaction "of any information furnished by that party: (1) that is a trade secret or commercial or financial in substance and is privileged or confidential; or (2) that includes medical files or similar files, the disclosure of which would constitute a clearly unwarranted invasion of privacy."  Vaccine Rule 18(b).  "An objecting party must provide the court with a proposed redacted version of the decision."  *Id.*  **If neither party files a motion for redaction within 14 days, the decision will be posted on the court's website without any changes.**  *Id.*

[2] The National Vaccine Injury Compensation Program is set forth in Part 2 of the National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755, codified as amended, 42 U.S.C. §§ 300aa-10 to 34 (2012) (hereinafter "Vaccine Act" or "the Act").  Hereinafter, individual section references will be to 42 U.S.C. § 300aa of the Act.

## I.      Procedural History

The Finding of Fact provides a procedural history of this case from the time petitioner filed her petition until I issued a Finding of Fact on December 8, 2022.  Finding of Fact (ECF No. 40).  I found that the petitioner had established that the onset of her right shoulder pain began within 48-hours of her receiving the Tdap vaccine on October 2, 2019.  *See Moore v. Sec'y of Health & Human Servs.,* No. 20-1589, 2022 WL 17986133 (Fed. Cl. Spec. Mstr. Dec. 8, 2022).

On January 30, 2023, respondent filed an amended Rule 4c report requesting that I decide the issue of entitlement.  Respondent ("Resp.") Amended Rule 4(c) Report ("Rept.") (ECF No. 44).  On January 31, 2023, I issued a Ruling on Entitlement finding that petitioner had established she suffered a Table SIRVA.  Ruling on Entitlement (ECF No. 45).  A Damages Order was issued afterwards, and the parties engaged in unsuccessful negotiations to settle the case.

On March 8, 2023, petitioner filed a status report stating that respondent had presented a proffer to petitioner, which petitioner rejected.  Petitioner ("Pet.") Status Rept. (ECF No. 48).  The parties were ordered to file briefs in support of their respective position on damages.  Scheduling Order (ECF No. 49).

Petitioner filed her brief in support of damages on April 24, 2023.  Pet. Mot. (ECF No. 50).  Petitioner stated, "The parties subsequently attempted informal resolution and agreed to compensation in the amount of $8,891.00 in lost wages and $1,420.26 in past unreimbursed expenses, but unfortunately reached an impasse regarding Petitioner's pain and suffering."  Pet. Mot. at 1.  In her brief, petitioner argued that she should be awarded $125,000.00 in past pain and suffering.  *Id.* at 3.

Respondent filed a reply to petitioner's brief on June 7, 2023.  Resp. Response ("Brief") (ECF No. 51).  In the response, respondent stated, "Based on the facts of this case and damages awarded in recent, comparable cases involving SIRVA, respondent recommends compensation for pain and suffering in the amount of $92,500.00."  Resp. Brief at 2.  Respondent agreed with petitioner on lost wages and unreimbursable expenses.  *Id.* at n.1.

Petitioner did not file a reply.  This matter is now ripe for adjudication.

## II.     Legal Standard

The Vaccine Act provides that "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury," a petitioner may recover "an award not to exceed $250,000."  42 U.S.C. § 300aa-15(a)(4).  With regard to pain and suffering and all other elements of damages, the petitioner bears the burden of proof and the medical records are the most reliable evidence of petitioner's condition.  *See, e.g.*, *Brewer v. Sec'y of Health & Human Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996); *Shapiro v. Sec'y of Health & Hum. Servs.,* 101 Fed. Cl. 532, 537-38 (2011).

Prior to my appointment as a special master, former Chief Special Master Golkiewicz and others developed an approach with the goal "to fairly treat all petitioners" by "creat[ing] a continuum of injury", in which the statutory cap was reserved for the most severe injuries and lower awards were made for less severe injuries. *Hocraffer v. Sec'y of Health Human Servs.*, No. 99-533V, 2007 WL *914914, at *5 (Fed. Cl. Spec. Mstr. Feb. 28, 2007). In *Graves¸* Judge Merow granted review of a special master's pain and suffering award, holding that the "continuum" approach was not "rooted in the statute or precedent". *Graves v. Sec'y of Health and Human Servs.,* 109 Fed. Cl. 579, 590 (2013). Judge Merow set forth a different approach in which the first step is to assess an individual petitioner's pain and suffering by looking to the record evidence, without regard to the $250,000 cap. Only then as a second step, if the award would exceed $250,000, must it be reduced to that maximum. *See id.* at 589-90.

In the Vaccine Program's subsequent history, special masters have of course not been bound by *Graves*.[3] However, they have found it to be persuasive. *See, e.g.*, *I.D. v. Sec'y of Health & Human Servs.*, No. 04-1593V, 2013 WL 2448125, at *10 (Fed. Cl. Spec. Mstr. Moran April 19, 2013) ("Under the interpretation of the statute offered in *Graves*, cases that used the spectrum approach, such as *Hocraffer* and *Long*, are no longer useful measuring points"); *Reed v. Sec'y of Health & Human Servs.*, No. 16.1670V, 2019 WL 1222925, at *12 (Fed. Cl. Chief Spec. Mstr. Dorsey Feb. 1, 2019) ("it must be stressed that pain and suffering is not based on a continuum"); *Selling v. Sec'y of Health & Human Servs.*, No. 16-588V, 2019 WL 3425224, at *5 (Fed. Cl. Spec. Mstr. Oler May 2, 2019) ("Pain and suffering is not, however, determined based on a continuum"); *Dillenbeck v. Sec'y of Health & Human Servs.*, No. 17-428V, 2019 WL 4072069, at *13 (Fed. Cl. Spec. Mstr. Corcoran July 29, 2019) ("… special masters appear to have accepted *Graves*'s methodology since issuance of that decision… I will apply it herein as well, although I do so mindful of the need to consider the overall strength of petitioner's showing herein"), *motion for review granted and remanded on other grounds,* 147 Fed. Cl. 131 (2020); *W.B. v. Sec'y of Health & Human Servs.*, No. 18-1364V, 2020 WL 5509686, at *3 (Fed. Cl. Chief Spec. Mstr. Corcoran Aug. 7, 2020) ("it must be stressed that pain and suffering is not based on a continuum"). I agree with this prevailing approach and have followed it in assessing pain and suffering damages in other SIRVA cases. *See Desai v. Sec'y of Health & Human Servs,* No. 14-811V, 2020 WL 8768069 (Fed. Cl. Spec. Mstr. Dec, 21, 2020), *recon. denied,* 2020 WL 8184767 (Fed. Cl. Spec. Mstr. Dec. 18, 2020).; *Yost v. Sec'y of Health & Human Servs.,* No. 18-288V, 2022 WL 4593029 (Fed. Cl. Spec. Mstr. Aug. 29, 2022); *Youngmark v. Sec'y of Health & Human Servs.,* No. 17-1431V, 2022 WL 2306867 (Fed. Cl. Spec. Mstr. May 25, 2022); *Galante v. Sec'y of Health & Human Servs.*, No. 18-1933V, 2023 WL 1515357 (Fed. Cl. Spec. Mstr. Jan. 13, 2023). I assess the full value of the damages in a particular case before me, then apply the statutory cap if that becomes necessary.

There is no mathematical formula for assigning a monetary value to a person's pain and suffering and emotional distress. *I.D.*, 2013 WL 2448125, at *9 ("[a]wards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula"). Factors

---

[3] Decisions of special masters and the U.S. Court of Federal Claims constitute persuasive but not binding authority. *Hanlon v. Sec'y of Health & Human Servs.*, 40 Fed. Cl. 625, 630 (1998). In contrast, the Federal Circuit's holdings on legal issues are binding on special masters. *Guillory v. Sec'y of Health & Human Servs.*, 59 Fed. Cl. 121, 124 (2003), *aff'd*, 104 F. App'x 712 (Fed. Cir. 2004); *see also Spooner v. Sec'y of Health & Human Servs.*, No. 13-159V, 2014 WL 504728, at n.12 (Fed. Cl. Spec. Mstr. Jan. 16, 2014).

to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering. *Id.* at *9 (internal citations omitted). I find it appropriate to also consider any impairments in function and/or lost ability to participate in activities which the petitioner previously enjoyed, as a result of the injury.

A special master may also consider prior pain and suffering awards, especially for similar injuries, from both inside and outside of the Vaccine Program to aid the resolution of the appropriate amount of compensation for pain and suffering in this case. *See, e.g.*, *Doe 34 v. Sec'y of Health & Human Servs.*, 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case."). A special master may also rely on his or her own experience adjudicating similar claims. *Hodges v. Sec'y of Health & Human Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993) (noting that Congress contemplated that special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims).

### III.   Parties' arguments

#### 1.   Petitioner's position

Petitioner argued that she should be awarded $125,000.00 for actual pain and suffering. Pet. Mot. at 3. She stated that prior to the vaccination, she was a "competent, independent, healthy adult," working as a charge nurse at an assisted living facility and taking college courses to complete her nursing degree. *Id.* Petitioner stated that she felt pain in her right arm immediately and her pain in her right arm was "continuous," since the vaccination. *Id.* The pain remained continuous and had worsened over a three-month period during which she had medical appointments about her right shoulder.

An MRI taken on January 7, 2020 revealed a full-thickness tear involving the anterior aspect of the supraspinatus tendon and a mild subacromial/subdeltoid bursitis that was contiguous with the focal rotator cuff tear. Pet. Mot. at 4; *see also* Pet. Ex. 3 at 22-23. Petitioner continued to have reduced range of motion. *Id.* For example, petitioner's treating nurse practitioner, Bridget Molloy, observed petitioner had "decreased range of motion in the right upper extremity due to subjective pain in right shoulder with [range of motion] exercises (active and passive). Patient unable to lift her [right upper extremity] above shoulder level due to pain/severity of pain." Pet. Ex. 15 at 30. When petitioner sought an opinion from orthopedist, Dr. William Smith, he recommended that she undergo a shoulder arthroscopy with rotator cuff repair. Pet. Ex. 7 at 10.

On May 19, 2020, petitioner had a right shoulder arthroscopy, which included a supraspinatus tendon repair, biceps tenodesis, and subacromial decompression with bursectomy. Pet. Ex. 7 at 5. At petitioner's second follow-up appointment with Dr. Smith, she wanted to begin formal physical therapy and return to work in August 2020. From July 9, 2020 through August 5, 2020, petitioner participated in seven formal physical therapy sessions. *See* Pet. Ex. 9. On August 5, 2020, Dr. Smith stated that petitioner had "excellent strength and full recruitment and very good shoulder rhythm," with her strength matching her left side, petitioner still

4

experienced stiffness in her right shoulder on rotational arc. *See* Pet. Ex. 7 at 11. Dr. Smith asked that she schedule a follow-up appointment in one year.

Petitioner argued that the duration of her pain and suffering continued past her right shoulder surgery. Pet. Mot. at 6. In her supplemental affidavit, executed on November 11, 2020, petitioner stated, "Since the vaccinations, my life has taken a downward spiral," and that the surgery she underwent "resulted in a long, agonizing recovery. I am required to stay out of work for at least 12 weeks to ensure proper healing." Pet. Ex. 13 at 2. Additionally, petitioner stated that she has to wear a pillow sling 24/7, she requires help getting dressed, cannot drive, and she was finding it extremely difficult to perform any daily activity, as this injury was to her dominant arm. *Id.* at 2-3. In her brief, petitioner argued that the duration of her suffering was approximately 2 years and had ongoing soreness, difficulty sleeping on her injured side, and had to modify her work activities. Pet. Mot. at 7.

In support of her position, petitioner referenced *Meyers, Leslie,* and *Reynolds,* SIRVA cases where the petitioners were awarded over $120,000.00 in pain and suffering. Pet. Mot. at 7-8. Petitioner argued that her "claim of actual pain and suffering and emotional distress is comparable to, if not more significant than that of [the petitioner in *Meyers*]," because petitioner underwent "multiple diagnostic imaging, required several more sessions of formal physical therapy, a home exercise plan, and continued formal treatment for her shoulder for approximately two years, warranting an award slightly larger," than $122,500.00. *Id.* at 7. Petitioner also averred that her pain and suffering was "more significant" than the petitioner in *Leslie,* because the petitioner in *Leslie* did not undergo shoulder surgery and was still awarded $125,000.00 in actual pain and suffering. *Id.*; *see also Leslie v. Sec'y of Health & Human Servs.,* No. 18-39V, 2021 WL 837139, at *11 (Fed. Cl. Spec. Mstr. Jan. 28, 2021). Additionally, petitioner stated that she and the petitioner in *Reynolds* are similarly situated, in that they both underwent surgery after their post-vaccination injury and participated in formal physical therapy. *Id.* at 10; *see also Reynolds v. Sec'y of Health & Human Servs.,* No. 19-1108V, 2021 WL 3913938 (Fed. Cl. Spec. Mstr. July 29, 2021). Thus, an award of $125,000.00 is warranted. *Id.*

## 2. Respondent's position

Respondent argued that the appropriate amount of compensation for petitioner's pain and suffering is $92,500.00. Resp. Brief at 2. Respondent asserted that petitioner's injury was "mild" in severity and "limited" in duration. *Id.* at 7.

Respondent referenced *Hunt* and *Shelton,* two other post-surgical SIRVA cases where petitioners were awarded less than $100,000.00 in pain and suffering in support of his position. Resp. Brief at 7. Respondent stated that petitioner's course of treatment is comparable to the petitioner in *Hunt,* who received two steroid injections, underwent arthroscopic shoulder surgery, participated in nine post-surgical physical therapy sessions, and received two additional steroid injections. *See Hunt v. Sec'y of Health & Human Servs.,* No. 19-1003V, 2022 WL 282662, at *2-3 (Fed. Cl. Spec. Mstr. June 16, 2022). The Chief Special Master, awarding $95,000.00 in pain and suffering to the petitioner in *Hunt,* reasoned that the petitioner had suffered a "mild-to-moderate SIRVA with periods of little-to-no-pain." *Id.* at *8. In *Shelton,* the petitioner was awarded $97,500.00 in pain and suffering after sixteen physical therapy sessions, three steroid

injections, and undergoing arthroscopic shoulder surgery. *Shelton v. Sec'y of Health & Human Servs*, No. 19-279V, 2021 WL 25500093 (Fed. Cl. Spec. Mstr. May 21, 2021). Additionally, the petition in *Shelton* had pain levels that varied from 8/10 to 2/10 and participated in 10 post-surgical physical therapy with pain relief being achieved at the last physical therapy session. *Id.* at *8.

Respondent stated that petitioner's treatment course was shorter in duration than both the petitioners in *Hunt* and *Shelton* and had full function approximately ten-months post-vaccination. Resp. Brief at 8. Respondent also argued that the statements petitioner made about having to sleep in a recliner and needed assistance to perform activities of daily living were made in close temporal relationship to her shoulder surgery and did not demonstrate that she maintained this level of debility after returning to work in August 2020. *Id.* at 8. Finally, respondent called into question petitioner's claim that she "continued formal treatment for her shoulder for approximately two years," as there is a 13-month gap in treatment for her right shoulder between August 5, 2020 and September 13, 2021. *Id.*

Finally, respondent argued that the cases cited by petitioner are "inapposite" and easily distinguishable "because petitioner did not sustain a severe injury, was not permanently disabled, and received treatment for her injury for less than one year." Resp. Brief at 10. Respondent observed that in *Reynolds,* the petitioner's treating physician classified the shoulder injury as "permanent in nature," and that the petitioner risked exacerbation or repeat irritation with activity. *Id.*; *see also Reynolds,* 2021 WL 39113938, at *4. Respondent argued that the petitioner in *Meyers* had a more aggressive treatment course, receiving two steroid injections prior to surgical intervention and the petitioner in the present case did not receive any steroid injections. Resp. Brief at 9.

Respondent agreed that petitioner should be awarded $8,891.00 in lost wages and $1,420.26 in past unreimbursed expenses, but that the amount of pain and suffering offered by respondent was fair because petitioner's injury "was not severe," and that her injury was limited to two years. Resp. Brief at 10.

### IV.    Analysis and conclusion

As noted above, factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering. *I.D.*, 2013 WL 2448125, at *9. Impairment of function and loss of activities are also considered. It does not appear that the parties dispute petitioner's awareness of her injury. *See* Resp. Brief at 10 (stating "petitioner understood her injury."). The main dispute between the parties is the severity and duration of petitioner's pain related to the injury.

The medical records and petitioner's affidavits demonstrated that petitioner experienced the onset of "continuous pain" at the Tdap injection site in her right arm since her vaccination on October 2, 2019. *See* Pet. Ex. 15 at 21; Pet. Ex. 13 at 2. Petitioner stated that she believed that the onset of her pain was normal because she is a nurse. Pet. Ex. 13 at 2. On October 25, 2019, petitioner had an appointment with Courtney Marcotte, RPA-C on October 25, 2019, where she reported that her right shoulder was "painful to rotate." Pet. Ex. 15 at 21. By the time petitioner

had her next appointment on December 12, 2019, petitioner expressed "frustration" over her constant ache in her right deltoid.  Pet. Ex. 15 at 24.  At this appointment, petitioner explained that "nothing has improved" since X-ray on October 25, 2019 and that her pain had increased despite icing, applying heat, and taking over-the-counter medication.  *Id*.  In addition to the X-Ray on October 25, 2019, petitioner had an MRI of her right shoulder on January 7, 2020.  Pet. Ex. 5 at 212-13.  The MRI showed "a full thickness tear of the supraspinatus tendon located anteriorly, proximity to the rotator cuff interval with approximately 7 mm of retraction and the tear occurring approximately 7 mm from the insertion on the greater tuberosity."  *Id*.  Additionally, "a small amount of fluid in the subcutaneous acromial/subdeltoid bursa," was identified and a "small focus of fluid" was identified "just superior to the rotator cuff interval with a thin rim of peripheral enhancement….that appears to be contiguous with the subacromial/subdeltoid bursa."  *Id*.  The impression was, "Localized full-thickness tear involving the anterior aspect of the supraspinatus tendon," and "mild subacromial/subdeltoid bursitis that appears to be contiguous with the focal rotator cuff tear."  *Id*. at 213.

After the MRI, petitioner went back to NP Malloy where it was noted that petitioner could not abduct her right upper extremity more than 30 degrees and could not lift her [right upper extremity] above her head or place it behind her back.  Pet. Ex. 15 at 28.  Petitioner had a consult with orthopedist, Dr. William Smith on April 15, 2020, when he recommended a shoulder arthroscopy with rotator cuff repair because "the medical literature suggests a better outcome with earlier surgical management, especially in someone with [a] dominant arm problem."  Pet. Ex. 7 at 10.  During the physical exam, petitioner had a "markedly positive" Whipple and Hawkins test, and petitioner could not put her arm behind her back due to pain.  *Id*.  She underwent a right shoulder arthroscopy, arthroscopic rotator cuff repair, biceps tenodesis, and subacromial decompression on May 19, 2020.  *Id*. at 4-5.  During her recovery, petitioner had to use an abductor pillow sling and was out of work.  *Id*. at 4.  At her follow-up appointment on July 6, 2020, Dr. Smith observed that petitioner's external rotation was back to neutral and her internal rotation "was quite good."  *Id*.  He recommended formal physical therapy.  *Id*.  Petitioner participated in seven physical therapy sessions with benefit.  Pet. Ex. 9.  Petitioner's strength and active range of motion showed improvement by July 30, 2020.  *Id*. at 21.  By August 4, 2020, petitioner reported that she could "carry on by myself now," and was asked to be discharged from formal physical therapy.  *Id*. at 39.  The following day, August 5, 2020, petitioner had an appointment with Dr. Smith, who gave her "the green light to return to full unrestricted activities and work duties at this stage," but recommended that she continue a strengthening regimen for a year and then return after a year for final follow-up.  Pet. Ex. 7 at 2.

Petitioner followed-up as instructed by Dr. Smith on September 13, 2021.  Pet. Ex. 18 at 3.  Petitioner reported she had some soreness with activity on occasion and "takes work more slowly and cautiously with her repaired shoulder."  *Id*.  After a physical exam of her right shoulder, Dr. Smith stated that it was not wrong for her "to protect her shoulder against sudden eccentric load."  *Id*. at 3.  He encouraged her to "get out and get active."  *Id*.

Based on the medical records and petitioner's statements in her affidavit, petitioner suffered a moderate to severe SIRVA for ten months, then mild for another three.  Although respondent attempts to cast petitioner's initial pain as "mild" because she treated with Ibuprofen and heating pads before opting for a surgery, this disregards the numerous records where

petitioner describes that her pain is "severe," and "constant," and the "symptoms are bad enough that they wake her up routinely" since the vaccination. *See* Pet. Ex. 15 at 23, 24, 28; Pet. Ex. 7 at 10. Additionally, respondent overlooks the fact that the physician's assistant that saw petitioner on October 25, 2019 recommended that she treat her right shoulder pain with Ibuprofen and a heating pad. Pet. Ex. 15 at 23. Furthermore, after the surgery, petitioner stated that she slept in a recliner for at least seven weeks, needed assistance for activities of daily living, and she had to use a pillow sling for 24 hours a day. Pet. Ex. 13 at 2-3; *see also* Pet. Ex. 7 at 4. Petitioner did benefit from physical therapy sessions in July 2020 and was able to return to work in August 2020.

The two cases respondent offered, *Hunt* and *Shelton,* are only like the present case in that they both involve a SIRVA with arthroscopic surgery. While the petitioner in *Hunt* had arthroscopic surgery six-months post-vaccination, the injury was to the petitioner's non-dominant arm and the petitioner had periods of pain relief with the use of cortisone injections prior to surgery. *See Hunt,* 2022 WL 282662, at * 2-3. Here, petitioner experienced severe pain for a period of eight months, the injury was to her dominant arm, and the use of conservative treatment with cortisone injections and physical therapy was cautioned against by her orthopedist, Dr. Smith. *Hunt* is not persuasive.

*Shelton* is equally unpersuasive. While the petitioner in *Shelton* had a right shoulder arthroscopy, the Chief Special Master reasoned that an award of under $100,000.00 for pain and suffering is reasonable, in part because the petitioner delayed seeking medical treatment for her shoulder pain post-vaccination for five months. *Shelton,* at *8. The Chief Special Master wrote, "…the fact that petitioner could cope with her injury for such a long period of time counsels in favor of a lower pain and suffering award." *Id.* In this case, petitioner sought medical attention for her right shoulder pain within the same month that she received the Tdap vaccine. *See* Pet. Ex. 15 at 21. Additionally, petitioner initially had a reasonable belief that the pain in her right shoulder was normal after a vaccination and would go away on its own.

Furthermore, respondent's arguments that petitioner did not engage in physical therapy or receive cortisone injections prior to opting for surgery is not evidence that her pain was mild. "The fact that a petitioner must undergo arthroscopic surgery to alleviate symptoms inherently suggests a greater level of pain and suffering…" *Barry v. Sec'y of Health & Human Servs.,* No. 20-1874V, 2023 WL 4742421, at *4 (Fed. Cl. Spec. Mstr. June 23, 2023). Additionally, petitioner was following the advice of her orthopedic surgeon, Dr. Smith, who counseled her that "the literature suggests a better outcome with earlier surgical management, especially in someone with dominant-arm problem." Pet. Ex. 7 at 10.

I find that the *Reynolds* case petitioner referenced is most similar to the petitioner's case. In *Reynolds,* the petitioner suffered a SIRVA to his dominant arm and also underwent arthroscopic surgery. *Reynolds,* at *2-3. The petitioner in *Reynolds* participated in one month of physical therapy and was able to return to activities, with the possibility of risking exacerbation with excessive activity. *Id.* at *4. The Chief Special Master reasoned that $125,000.00 was an appropriate amount for pain and suffering because petitioner's "active treatment as well as the most severe pain occurred within the first year, after which he reached maximum medical improvement." *Id.* The petitioner in this case also had a relatively good recovery after surgery

8

and was able to return to work by August 2020. She also appeared to follow Dr. Smith's request to have a follow-up visit one year after the surgery, which she eventually had on September 13, 2021. While there are no records indicating what petitioner's pain levels were in the year between her visits with Dr. Smith, petitioner did explain to Dr. Smith at her one-year follow-up visit that was she was guarding her right shoulder while at work, she was no longer able to sleep on her right shoulder, and on occasion would have some soreness with activity. *See* Pet. Ex. 18 at 3. Dr. Smith seemingly agreed that petitioner could "protect her shoulder against sudden eccentric load[s]." *Id.* Thus, from this record is appears that petitioner had a relatively good recovery after engaging in physical therapy, albeit, had some residual pain and discomfort with activity.

Accordingly, in the present case, I find that an appropriate award for past pain and suffering is $125,000.00.

## V.     Conclusion

Based on the record as a whole and the arguments of the parties, I award petitioner a lump sum payment of **$135,311.26, representing $125,000.00 in past pain and suffering, $8,891.00 in lost wages, and $1,420.26 in out-of-pocket expenses. This amount represents compensation for all damages that would be available under § 300aa-15(a).**

**The Clerk of the Court is directed to enter judgment in accordance with this decision.**

**IT IS SO ORDERED.**

<u>s/Thomas L. Gowen</u>
Thomas L. Gowen
Special Master